THE WILLIAM ROGERS MANUFACTURING COMPANY *vs.* SIMPSON, HALL, MILLER AND COMPANY.

Hartford District, Oct. T., 1886.  PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

William Rogers, for twenty-five years before his death in 1873, had a valuable reputation in the market as a manufacturer of silver-plated ware.  A son of the same name acquired skill under him in the same manufacture, and since 1864 had had a valuable independent reputation in the market as a manufacturer of the same goods.  In 1878 the second William Rogers made a contract with the defendant corporation by which it was agreed that he should exercise his skill in superintending their manufacture of silver-plated ware, and direct as to its quality and style, and allow his name to be stamped thereon and defend its use; in consideration of which he was to receive a commission upon sales.  The plaintiff corporation had since 1872 been engaged in the manufacture of silver-plated ware, and used sundry trade-marks, of which the name "William Rogers" was the principal part, claiming to own the exclusive right to such stamps by the agreement of the first William Rogers and by long-cont ued use.  In a suit brought by the last-mentioned company against the other for an injunction against the use of the name "William Rogers" as a trade-mark, it was held:—

1. That the second William Rogers had the right to use his name as the important part of his trade-mark so long as it was accompanied with devices to distinguish it from the trade-marks of the plaintiffs, and was not used for the purpose of misleading purchasers, although purchasers who took note only of the words " William Rogers," or were not familiar with the stamps of the plaintiffs, were liable to be misled.

2. That under the arrangement by which the goods were manufactured by the defendant corporation under the superintendence of the second William Rogers, and with an interest on his part in the manufacture and sale, they had a right to use the name of William Rogers in their trade-mark in the same manner that he could have done if he had been the direct manufacturer.

When the second bearer of a name which has become the distinguishing part of a trade-mark used by another manufacturer, uses the same name as a part of his own trade-mark, with proper distinguishing devices, it is not a sufficient reason for enjoining the latter against the use of the name, that the goods of both manufacturers become known in the market by the same name. He is not to be injuriously affected by any use the public may make of a mark which the law allows him to use.

If purchasers who will take note of nothing but the name upon the trade-mark are misled, and there is consequent loss to either of the parties entitled to use the name, it must be borne as a consequence of the act of taking the name as a trade-mark.

[Argued November 10th, 1886,—decided February 25th, 1887.]

SUIT for an injunction against the use of a certain name in a trade-mark, and for an account and damages; brought to the Superior Court in Hartford County. The following facts were found by a committee :—

The plaintiff is a corporation organized in 1872, under the joint-stock laws of this state, located in Hartford, and engaged in the manufacture and sale of spoons, forks and knives. It succeeded to the business of a partnership of the same name which had been formed in 1865.

For one or two years after its organization as a corporation its sales were considerable, amounting to nearly $140,000 in 1873, which was its best year. After that its sales gradually decreased, until, in 1877, they amounted to less than $40,000. From that time forward until the spring of 1879 the business was still smaller, and the goods which purported to be of its manufacture were made, plated, and

stamped for it at Waterbury, by Rogers & Brother, a corporation by that name, engaged in the same business and located in the latter city.

The plaintiff at all times had goods in the market bearing its stamp, and had a travelling salesman out, and its goods were, to a limited extent, on sale in the markets of the country, and were sold to and by dealers in Hartford.

In the year 1879 the management of the William Rogers Manufacturing Company was consolidated with that of the Rogers Cutlery Company, another corporation located in Hartford, and was officered by the managers of the latter company, and from that time the business of the plaintiff has considerably increased.

The goods manufactured by the plaintiff have had a good reputation.

About the year 1847 three brothers, all now deceased, William, Asa H., and Simeon S. Rogers, engaged in the manufacture of electro-silver-plated spoons, forks and knives at Hartford, under the partnership name of Rogers Brothers. Prior to that time William and Simeon had been engaged in the general jewelry and plated-ware business in State street at Hartford, under the firm name of William Rogers & Co. Asa had learned the art of electro-silver-plating, and was the only practical plater of the three.

The spoons, forks and knives manufactured by the copartnership were stamped " [Star] Rogers Brothers A 1," or " [Star] Rogers Bros. A 1," and such stamps became well known in the trade as indicating goods manufactured by the firm. In the copartnership thus formed William traveled, selling goods, and when at home exercised a general superintendence over the whole business. Simeon managed the store. Asa did the plating. William Rogers, Jr., was employed as a general assistant.

Electro-silver-plating was then a novel manufacture, and because principally of their integrity in the manufacture, the goods of the Rogers Brothers being found to answer their recommendation as honest goods, the goods of their

manufacture acquired a valuable reputation in the market, and as early as 1853 became known as " Rogers goods."

[Facts are then found in much detail with regard to various partnerships or corporations with which some or all the Rogers brothers were connected, and which were authorized to use the name of " Rogers " as a part of their trade-marks, and especially the name of William Rogers, for the purpose of showing how far the plaintiff corporation was entitled to the trade-marks which it was seeking to protect; but as the court does not consider this question in deciding the case, the facts that relate to it are omitted.]

Before the bringing of this suit the following stamps had at various times been put upon goods sent into the market by the copartnership of William Rogers Manufacturing Company, the plaintiff corporation of the same name, and the Rogers Cutlery Company:—" 1847, Wm. Rogers & Son A 1."—" Wm. Rogers & Son."—" 1776 Wm. Rogers & Son."—" (Anchor) Wm. Rogers & Son AA."—" (Anchor) W. R. & Son AA."—" 1865 Wm. Rogers Mfg Co. AA."—" Rogers Nickel Silver."—" Rogers Cutlery Company."—" Rogers Silver Plate Company."   The stamp first adopted by the copartnership was " 1847, Wm. Rogers & Son A 1." Having been enjoined against the use of the prefix " 1847," and the suffix " A 1," upon the petition of the Meriden Britannia Company in September, 1872, they for a short time used " Wm. Rogers & Son," and " 1776 Wm. Rogers & Son," and then adopted " (Anchor) Wm. Rogers & Son AA," and " 1865 Wm. Rogers Mfg Co.," which has been sometimes used with and sometimes without the prefix " 1865."   " (Anchor) W. R. & Son AA." was used only on small articles from lack of room.   " Rogers Cutlery Co." was used by that company and not by the plaintiff, and " Rogers Silver Plate Co." was used only on some job lots.

Wm. Rogers died in 1873; Simeon S. Rogers in 1874; and Asa H. Rogers in 1876,

During the respective lives of these brothers they uniformly claimed that the original stamp of " Rogers Broth-

ers" and the other so-called Rogers stamps used by them, or either of them, or by the companies with which they or either of them were connected, were their personal trade-marks, and denoted that the goods to which they were applied were manufactured under their personal superin-tendence and guaranty of quality.

While the brothers, together or separately, were engaged in such manufacture, either for themselves or for the com-panies with which they were connected, the stamps so used by them or either of them did represent, and were under-stood by the public to represent, such superintendence and guaranty; but the stamps continued to be used by the com-panies after such connection had ceased, under a claim of right so to do, and have come to represent not the personal superintendence and guaranty of the brothers or either of them, but that the goods bearing such stamps are of the same good quality as the goods which were manufactured under the personal superintendence of the brothers, and that the companies using them are the legitimate successors to the brothers in the use of the marks.

The marks are valuable to the parties using them. There was nothing peculiar or mysterious in the art of electro-silver-plating, known to the Rogerses and not known to any skillful silver-plater, and it was their diligence, integ-rity and skill, and their persistent and undeviating require-ment that their trade-marks or names should be placed only upon goods of their standard by the various companies with which they were connected in business, that marks used by them, of which the name "Rogers" formed a part, gave to such goods a valuable reputation.

By reason of the numerous stamps on spoons, forks and knives, containing the word "Rogers," as before stated, and of the efforts of the various concerns who had used such stamps since 1847 to promote the sales of their goods as "Rogers goods," the word "Rogers" had, before the bring-ing of this suit, become the conspicuous and familiar part of such stamps to a large class of the retail buyers; but jobbers and those retail buyers who are informed in rela-

tion to the trade-marks, and the several manufacturers represented by them, readily distinguish between the stamps of the different manufacturers by the words or symbols which such stamps do not possess in common. Many of those retail buyers who buy only by the stamp, look only to the word " Rogers," and are for this reason liable to confound the various stamps, but generally the retail buyers who desire any information on the subject of the maker of the goods rely upon the dealer for such information.

A large proportion of the ultimate purchasers are not familiar with the various marks and their signification, as indicating a particular make, but look merely to see if they are Rogers goods, and usually rely upon the statements of the seller, and are satisfied if they are stamped with the name " Rogers " in some form.

A limited portion of such purchasers are familiar with the various stamps, and such have no difficulty in distinguishing one stamp from another, and are not liable to be deceived if they desire a particular stamp.

In the year 1864 William Rogers, Jr., and William J. Pierce formed a business connection, under which silver-plated spoons and forks were furnished to the trade, bearing the stamp of William Rogers, Jr., the arrangement being that Rogers should receive a commission for the right to stamp such goods with his name; Rogers to sell the goods as the manufacturer, and Pierce not to be personally known in the business.

William Rogers, Jr., is the son of William Rogers, Sr. He had been brought up by his father in the jewelry and plated-ware business of William Rogers & Co., at State street in Hartford, and became associated with his father in 1856, under the firm name of Wm. Rogers & Son, which firm continued until the year 1861. He had also assisted his father generally in the original business of Rogers Brothers, and had always been in familiar association with his father in the latter's business affairs. His name originally was William H. Rogers, but, somewhere about 1856, he changed his name to William Rogers, Jr., for the purpose

of being more closely identified with his father, and had become known by that name.

The goods sold under this arrangement with Pierce were plated by him according to the Rogers standard, as agreed by the parties, and were advertised and sold as "Genuine Rogers goods," and equal to the goods of the original Rogers Brothers.

This arrangement continued about a year, and until the formation of the copartnership of the Wm. Rogers Manufacturing Company in 1865.

The Wm. Rogers Manufacturing Company co-partnership continued the use of the trade-marks after William Rogers and William Rogers Jr., who had been members of it, left the firm in March, 1868, and within a short time after obtained a temporary injunction against the Rogerses, father and son, restraining them from using the trade-marks or either of them; from representing that any person other than the Wm. Rogers Manufacturing Company had the right to use them; from interfering with the free use of the trade-marks by the Wm. Rogers Manufacturing Company, and from stating that that company had no right to use them. Wm. Rogers, Jr., was afterwards found in contempt for a violation of this injunction, and fined by the court therefor. The injunction continued in force until after the organization of the plaintiff corporation, when it was withdrawn by consent, without costs.

The Wm. Rogers Manufacturing Company continued its business as a copartnership and the use of the trade-marks until a transfer was made in January, 1872, to the plaintiff corporation. This corporation continued the business at Hartford, at the same place and in the same building, making goods of a good quality, and stamping them with the trade-marks ("Anchor) Wm. Rogers & Son, AA.," and "1865, Wm. Rogers Mfg. Co., AA.," and other stamps to a limited extent, and has claimed the right to use these stamps.

The goods manufactured by them or for them bearing these stamps have been up to the standard of quality known

as the Rogers standard. The standard has in fact been raised by the plaintiff and by the other companies making the so-called " Rogers goods."

The goods made and sold by the copartnership and the plaintiff corporation became familiarly known in the market as " William Rogers goods " and " Hartford goods."

The plaintiff has on signs, circulars, blotters and in advertisements used the name " Wm. Rogers & Son " as a business name, from which it might be naturally inferred by the public that William Rogers or his son William Rogers, Jr., was connected with the manufacture or business, or was the firm conducting the business. The managers of the plaintiff corporation have also stamped job lots of goods with the stamp " Rogers Silver Plate Co.," and registered this stamp as a trade-mark, there being no such company in existence. Such use and register was for the purpose of attempting to control the name and prevent other parties from using it. The managers of the corporation have also sent into the market since its consolidation with the Rogers Cutlery Company, spoons and forks stamped " Rogers Cutlery Co.," as one of its stamps, the stamp being used on goods on hand at the time of the consolidation of the two companies, which had been manufactured by the Rogers Cutlery Co. It has maintained to the public that its stamps are those of the original, genuine Rogers Brothers.

The defendant is a joint-stock corporation located at Wallingford, in this state, and for some years prior to 1878 had been engaged in the business of making and selling plated ware, both flat and hollow, stamping its flat-ware " Simpson, H. M. & Co.," or with the initials " S. H. M. & Co.," accompanied with devices denoting the quality.

The hollow-ware, stamped with the name of the corporation, sold well and had a high reputation in the market, but its flat-ware, although of good quality and finish, did not find a ready market, and its sales were quite limited.

Prior to 1878 the defendant, through its officers and agents, had made several attempts to connect with itself in some way some man by the name of Rogers, with a view to

stamping such name upon its goods. It had a contract in 1867 with William Rogers and William Rogers, Jr., with reference to the use of the stamp "Wm. Rogers & Son" upon its hollow-ware, and such was so used to some extent. The persons who composed its management had negotiations in 1876 with F. Willson Rogers, a younger son of William Rogers, at that time without practical experience in the business, looking to the formation of a company to be called the Rogers Silver Plate Company, under which name an organization was made and published, and that name was stamped upon a small lot of goods, but the negotiations fell through and nothing came of it. In 1872 some negotiations were had with one William W. Rogers, a machinist, with no practical knowledge of the plated ware business, and who was not connected in any way with the William Rogers before referred to.

In 1878 a contract between William Rogers and William Rogers, Jr., and the Meriden Britannia Company having expired, William Rogers having died, and William Rogers, Jr., being then out of business, the latter applied to the defendant for the purpose of making an arrangement with the corporation for the manufacture by it of silver-plated forks, spoons and knives, under his supervision and control, and with his stamp as a trade-mark. Some of the officers of the defendant had endeavored, in 1868, to make some arrangement of the kind with him and his father, but they then entered into the contract with the Meriden Britannia Company before referred to.

The officers of the defendant were at first suspicious that his application was made for the purpose of obtaining better terms in a new contract with the Meriden Britannia Company, but on becoming convinced that his proposition was in good faith, and that his relations with the latter company were fully terminated, they requested him to make a definite proposition, which was done, and the result was the making of a contract between himself and the defendant, of which the following are the parts important to the present case. The defendants are designated in the contract as the

party of the first part and William Rogers as the party of the second part. The contract is dated May 6th, 1878.

"1. The party of the second part agrees, upon the execution of this contract, to enter into the service of the party of the first part, with the general duty of superintending the electroplating, burnishing, buffing and finishing for the market of silver-plated flat-ware goods, manufactured by the party of the first part, of designing and determining the patterns to be used for such ware, of superintending the preparation and printing of all circulars, labels and boxes required for the sale of such ware, and of promoting, by all means in his power, the profitable sale of all goods, the preparation of which for market is placed under his superintendence by this contract.

"2. It is understood that the grade for plating of all silver-plated goods finished under this contract shall be according to the standard adopted by William Rogers, Sr., and also practiced by him and the party of the second part in their business copartnership of William Rogers & Son, and for spoons and forks shall be according to the following schedule :— * * * And the party of the second part agrees faithfully to inspect, oversee and superintend the plating of all goods which are the subject of this contract, and to see that such plating is in all respects so done as to make said goods in that respect equal to the standard aforesaid ; and for further security thereof, it is mutually agreed that the said party of the first part shall provide a suitable person, who shall, under oath, weigh such goods before and after plating, and keep a true record of such weight in a book to be kept for that purpose. * * * And said party of the second part shall have free access to all parts of the factory where such goods are being made, plated, finished, or stored.

"3. Said party of the second part further agrees faithfully to give his attention and supervision to the burnishing, buffing and assorting for the market, of all goods plated in accordance with the foregoing article, * * * and no commission, as is hereinafter provided, shall be paid by the party of the first part on the sales of any goods so prepared for

the market not of the first quality, or such as are known as imperfects or seconds. And from all such imperfect goods the name of Rogers shall be erased."

"5. The said party of the second part further agrees to furnish such patterns as may be needed for the goods which are the subject of the foregoing articles. * * * The styles and patterns used for goods so made shall not be used during this contract for any goods not made under his supervision, as aforesaid, and are to bear his name exclusively.

"6. Said party of the second part further agrees to give his time, abilities and influence, so far as may be necessary, to establishing and increasing the sale of the goods made under this contract, and that he will not, either for himself or others, directly or indirectly, while this contract is in force, engage in making or selling any article of what is commonly known as flat-ware, or to aid others in the same in any way whatever. * * * The party of the first part agrees not to use, directly or indirectly, any other name of Rogers during the continuance of this contract.

"7. All goods made under the superintendence of the party of the second part as provided by this contract shall be authenticated by the stamp of his name thereon, with such accompanying device as he may desire, and shall be so stamped at the factory of the party of the first part in Wallingford, and nowhere else, and the stamps used for that purpose shall be accessible to either party at all business hours. No other stamp shall be used on such goods without the consent of the party of the second part. Nor shall such stamp or device be used on any goods which are not the subject of this contract. Upon the termination of this contract the right to use said stamp shall remain with the party of the second part."

"9. The party of the first part, on its part, agrees to use all reasonable efforts to effect sales of the goods which are the subject of this contract, and to make the same efforts for that purpose that they do for the sale of hollow ware or other goods manufactured by them. The agents for the

sale of the last-mentioned goods shall solicit orders for the sale of the former, and the party of the first part agrees not to imitate, by label or otherwise, the goods which have been stamped by the party of the second part."

"11. The party of the first part agrees to pay the party of the second part, as compensation for the services hereinbefore mentioned, a commission on all sales of what is commonly known as flat-ware, bearing his stamp as aforesaid, as follows, to wit:— * * *

12. "All lawsuits against either party, involving the right to use the stamp hereinbefore mentioned, shall be defended at the expense of the party of the second part, and any judgment therein satisfied by him."

14. "This contract is to continue for the term of fifteen years from its date, unless sooner dissolved by mutual consent, with the privilege to the party of the first part of renewing the same for the same or any less period."

William Rogers at once entered into business with the defendant under this contract, and the business has been conducted by the parties in compliance with its terms.

The officers and managers of the defendant corporation were well aware of the value of the name "Rogers" as a stamp on silver-plated ware, if the person whom it represented belonged to the family of either of the Rogers brothers, and had been connected with them, or either of them, in the production of silver-plated goods, and who had a reputation in relation thereto, and was known to the trade; and they entered into the contract for the purpose of availing themselves of the use of the name of William Rogers as a trade-mark upon their flat-ware which should be made under his personal supervision and control, and also of availing themselves of his taste, skill and judgment in relation to the design, style and finish of such goods, and of his knowledge of the trade, and from the belief that the goods so manufactured, stamped and advertised would be well received as genuine Rogers goods.

When the contract was made the business of the plaintiff was at a low ebb, as hereinbefore stated; it was

not in the market as a formidable competitor and the defendant had no knowledge that it was in the market, and its conduct in making the contract was not actuated by any motive towards the plaintiff, but its motive was to enable it to compete more successfully in the market with the manufacturers of such goods. The effect of the use of the Rogers name was soon manifest in the increased and increasing sale of their goods so manufactured and stamped.

The defendant was well equipped for the manufacture of such goods of good style, quality and finish, before the contract with William Rogers was entered into, and no change has been made merely on account of his employment.

The goods made under the contract have been stamped " (Eagle) Wm. Rogers (Star) " in accordance with its provisions and for the purpose therein disclosed, and under the claim that by reason of his superintendence and control of the manufacture it was entitled to have the benefit in the market of the knowledge of the public that its goods were so manufactured, and the advantage in trade of whatever reputation William Rogers had acquired by reason of his connection theretofore with such manufacture and sale of electro-silver-plated goods in his association with the various parties with whom he has been engaged in the manufacture and sale of such goods, and by his long association with his father in his business operations relating to such manufacture.

From his boyhood William Rogers, Jr., has had some connection with the manufacture and selling of electro-plated silver-ware, principally spoons, forks and knives, by the various concerns with which his father was associated. Since 1864 down to the time of his connection with the defendant, his name had, by reason of his relation to the business as hereinbefore stated, and the efforts to that end of those with whom he had been associated, been known to the trade as that of the son of William Rogers, Sr., with whom he had been associated in the manufacture of electro-silver-plated goods, and had in consequence thereof obtained

a valuable reputation, so that goods stamped with his name, as indicating his supervision and guaranty of their manufacture, had by reason thereof a better selling value in the market.

From 1865 to 1878 he had been almost constantly employed in connection with such manufacture with the Wm. Rogers Manufacturing Company at Hartford, and the Meriden Britannia Company at Meriden, as before stated.

The portrait of William Rogers, Jr., in connection with that of his father, was extensively circulated by both of those companies, by which William Rogers, Jr., was prominently brought to the notice of the trade in connection with his father.

William Rogers, Jr., was not a manufacturer in the sense of making the blanks, or plating or finishing the goods. The value of his name consisted in his knowledge of the business, his skill and judgment in relation to the style and finish of the goods and the requirements of the trade, acquired by his long association with his father in the business, and in the fact that he as well as his father had always insisted that his name should only be used on goods of a certain high standard of quality. It was these characteristics which caused the great reputation of his father.

The blanks of the defendant's goods are made by the Simpson Nickel Silver Company of Wallingford, under contract with the defendant, as the blanks of the Meriden Britannia Company were prepared by Wallace & Sons during the period of William Rogers's connection with that company under the contract of 1868.

This manufacture includes the making, finishing and trimming the blanks. It is supervised and controlled in all its departments by William Rogers, and the work is required to be done to his acceptance, and his requirements have been close and exacting. This supervision also extends to the patterns and dies. The plating and completing of the manufacture, and its preparation for the market, are done at the factory of the defendant, and are under the same charge, supervision and control.

In plating, every piece is counted and weighed, and then plated, and afterwards weighed again to ascertain that the proper amount of silver is on each piece. This weighing is done by a sworn weigher, and the amount is recorded daily in a book for the purpose. Every portion of the work in the plating department, in flat-ware, is under the supervision and charge of William Rogers. In exercising this superintendence and charge he has been faithful, and, in particular, scrupulous to have his goods conform to his own standard of high quality ware, and the reputation of his family name.

The goods thus made and stamped " (Eagle) Wm. Rogers (Star) " are equal in quality to any goods in the market bearing a Rogers stamp.

His services are valuable to the defendant, and the stamp, by reason of its indication of his personal supervision and guaranty, is of special value to it. The arrangement existing between him and the defendant is valuable to him, and it is only through the medium of some such arrangement that he is able to make his special training in the business available to himself.

The stamp " (Eagle) Wm. Rogers (Star) " was not adopted for the purpose of imitating the trade-mark of the plaintiff, but as a new and distinctive trade-mark, indicating his personal supervision and control.

The stamp is put upon the goods in the usual and customary place and manner.

There is no difficulty in distinguishing between the stamp " (Eagle) Wm. Rogers (Star) " and the stamp "1865, Wm. Rogers Mfg. Co., AA.", and " (Anchor) Wm. Rogers & Son AA.", by those dealers or others who will examine the whole stamp and are familiar with the stamps which are used by the plaintiff; but those who regard the word " Rogers " or " Wm. Rogers " only, or who are not familiar with the stamps of the plaintiff, might readily confound them. As before stated, a large class of dealers is familiar with the various stamps used by the different makers of the so-called " Rogers goods," and would readily distinguish the

stamp of the defendant from all others, while many small dealers, and a large portion of the ultimate purchasers, are not familiar with the different stamps and their signification, and such dealers and purchasers usually rely upon the representations of the seller, and are satisfied with any stamp bearing the name Rogers, if they are represented to be genuine.

But a dealer or ultimate purchaser who desired goods made by the plaintiff, and was not familiar with its stamp, would readily take goods with the defendant's stamp, from the word " Wm. Rogers " being on the goods.

Purchasers who have a preference for a particular manufacture are as a rule familiar with its stamp, and persons so familiar would not be liable to confound the defendant's stamp with such, if they were observed.

The goods made by the plaintiff and by the copartnership of the same name became known in the market by the general appellation of " Wm. Rogers goods," and no other goods known by that name had ever been in the market except those made and sold by that copartnership and the plaintiff corporation, until the time that goods made by the defendant were put upon the market, since which time these goods have generally become known in the trade as " Wm. Rogers goods."

A purchaser ordering from a dealer simply " Wm. Rogers goods " would be as likely to get goods made by the defendant as those made by the plaintiff, unless he should designate them as Hartford or Wallingford goods, by which they are usually distinguished in the trade. And if the order were thus specific, it might be filled by the goods of either if he was not familiar with the respective stamps, or being familiar neglected to observe them.

The defendant has extensively advertised its goods as " the celebrated William Rogers goods," and as made under the personal supervision and guaranty of William Rogers, and explaining who he is and his former business connections. The plaintiff has followed this by advertisements describing its goods as " the genuine William Rogers

goods." Prior to these advertisements by the defendant no goods had been advertised as " William Rogers goods." Numerous circulars and advertisements issued by the defendant were annexed to the finding, which cannot be inserted here. The following is one of the briefer ones :—

" Sectional Plated Spoons and Forks.
" [Eagle] William Rogers x. 12.
" Triple Plated upon all points exposed to wear.
" Plated by the method invented by
" William Rogers in 1855,
" Who was the original inventor of
" Sectional Plate.
" Wm. Rogers,
" (Since 1878) Wallingford, Conn., formerly of Hartford and
" West Meriden."

The defendant knew that the use of their trade mark and their circulars and advertisements would cause their goods to become known in the market as " William Rogers goods." They were not however intended or calculated to induce the public to believe that the goods designated as " the celebrated William Rogers goods " were manufactured by the plaintiff. The purpose of the circulars and advertisements was to direct public attention to the fact that the manufacture of its goods was controlled by the William Rogers whose name they bear, and to the celebrity of its goods as it is claimed by reason of such control and association with his name.

The defendant knew that the goods which had been made and sold by the plaintiff had become known as " William Rogers goods," and when its advertisements were published it knew that the plaintiff's goods were in the market, and that it was continuing business.

The circular referred to is not misleading to a person familiar with the facts stated therein, and with the fact that William Rogers, Sr., died in 1873; but persons not so familiar might be led by it to suppose that the William Rogers who was the inventor of sectional plate in 1855, was in the

employ of the defendant at the time the circular was published.

Upon these facts the case was reserved for the advice of this court.

*F. Chamberlin* and *O. H. Platt*, with whom were *J. P. Platt* and *H. R. Mills*, for the plaintiff.

*First.* The stamps " (Anchor) Wm. Rogers & Son AA " and "1865 Wm. Rogers Mfg. Co. AA " are the plaintiff's trade-marks. (1) They were adopted, with the assent of the Rogerses, by the partnership which preceded the plaintiff. (2) They were conveyed by the copartnership, together with its property, business and good will, to the plaintiff corporation. (3) The transfer to the plaintiff corporation was made with the assent of William Rogers, Jr., Wm. Rogers, Sr., being then imbecile and incompetent. (4) And the trade-marks have been in actual use by the plaintiff upon its goods continuously since its organization in 1872 and prior thereto by the partnership from their adoption in 1865. The record is explicit on all these points. Thus it appears that these stamps, adopted in 1866, have been continuously used by the partnership and corporation to the present time—openly, adversely, and under claim of right as their trade-marks. " The trade-mark recognized by the common law is generally the growth of a considerable period of use rather than a sudden invention. * * * At common law the exclusive right to it grows out of its use, not its mere adoption." *Trade-Mark Cases*, 100 U. S. R., 94. "It is the actual use of the trade-mark, affixed to the merchandise of the manufacturer, and this alone, which can impart to it the element of property. The mere declaration of a person, however long and however extensively published, that he claims property in a word as his trade-mark, cannot even tend to make it his property." *Candee* v. *Deere*, 54 Ill., 439. "The right to use a trade-mark is above all other rights one which depends upon use." LOWELL, J., in *William Rogers Mfg. Co.* v. *Rogers & Spurr Mfg. Co.*, 11 Fed. Rep., 495. The plaintiff's right to the use of these

trade-marks may be regarded as settled by authority. *William Rogers Mfg. Co.* v. *Spurr & Rogers Mfg. Co.*, last cited; *Meriden Britannia Co.* v. *Parker*, 39 Conn., 460; *Rogers & Brother* v. *Rogers*, 51 id., 121.

*Second.* The stamp "(Eagle) Wm. Rogers (Star)," as used by the defendant, is an infringement of the plaintiff's trade-marks.

1. An exact imitation or similarity is not necessary. In *Meriden Britannia Co.* v. *Parker* it was found that the defendant's trade-mark resembled the plaintiff's "to that degree that it was calculated to deceive unwary purchasers and those who buy such goods hastily and with but little examination of the trade-mark; but purchasers who read the entire trade-mark on the defendant's goods, and who know the petitioner's trade-mark, cannot be deceived, nor can they mistake the respondent's goods for those of the petitioner." Upon this finding the court by CARPENTER, J., remarked:—"The fact that careful buyers, who scrutinize trade-marks closely, are not deceived, does not materially affect the question. It only shows that the injury is less; not that there is no injury. Another class of purchasers, to whom large quantities are sold, are deceived. Such purchasers, perhaps, will have no reason to complain, as they, if they are injured by the deception, must attribute the injury to their own want of diligence. But the petitioners stand on entirely different ground. No amount of diligence on their part will guard against the injury; an injunction is their only adequate remedy, and to that we think they are entitled." *Meriden Britannia Co.* v. *Parker*, 39 Conn., 460. "The criterion is not the certainty of success in misleading the public, but its probability—or even its possibility." DUER, J., in *Amoskeag Mfg. Co.* v. *Spear*, 2 Sandf., 549, approved by Mr. Upton in his work on trademarks, p. 136, and by Judge CARPENTER in *Boardman* v. *Meriden Britannia Co.*, 35 Conn., 415. To the same effect are—*Consolidated Fruit Jar Co.* v. *Thomas*, Cox's Manual, No. 665; *Royal Baking Powder Co.* v. *McQuade*, id., No. 671; *Wamsutta Mills* v. *Allen*, 12 Phila., 535; *Glenny* v. *Smith*,

11 Jur., N. S., 964; *Leggett* v. *Hines*, 2 Cent. L. J., 110; *Avery* v. *Meikle*, 27 U. S. Patent Office Gazette, 1027; *Manufacturing Co.* v. *Trainer*, 101 U. S. R., 65; *Landreth* v. *Landreth*, 22 Fed. Rep., 41. In *Williams* v. *Brooks*, 50 Conn., 280, the finding was of resemblance "to such a degree that they are liable to deceive careless and unwary purchasers who buy such goods hastily and with little examination; but purchasers who read the entire trademark and label on the defendants' goods cannot be deceived nor mistake the defendants' goods for the plaintiff's." It was not found that the defendants' goods were sold for the plaintiff's, and the defendants were found to have acted in good faith; but the defendants were enjoined. The findings in this case, in respect to similarity of marks, are as follows: "The stamp of the defendant is put upon the goods in the manner customary with other manufacturers;" that is, in the same place and manner as the plaintiff's. "Those who examine the whole stamp and are familiar with the stamps used by the plaintiff, have no difficulty in distinguishing;" which only means that there are differences which close examination and comparison reveal; but "those who regard the word Rogers or William Rogers only or who are not familiar with the stamp of the plaintiff, might readily confound them. A dealer or ultimate purchaser who desired goods made by the plaintiff, and was not familiar with its stamp, would readily take goods with the defendant's stamp, from the word 'William Rogers' being on the goods. The plaintiff's goods had been, for ten years or more, distinguished by the general appellation of 'William Rogers goods.' Since the defendant's goods, stamped as aforesaid, have been put upon the market, they have become generally known as 'William Rogers goods.'" "A purchaser ordering from a dealer simply 'William Rogers goods' would be as likely to get goods made by the defendant as those made by the plaintiff, unless he should designate the make, as Hartford or Wallingford goods, by which they are usually distinguished in the trade; and if the order were thus specific it might be filled by the goods of either, if he

was not familiar with the respective stamps, or, being familiar, neglected to observe them." We submit that the finding, upon the point of similarity of marks, is quite beyond that to be found in any of the cases in which the court has granted an injunction.

2. It is not necessary to show that the defendants have acted fraudulently. The law is the same both as to trademarks and trade-names. *Singer Mfg. Co.* v. *Loog*, L. R., 8 App. Cas., 15; Sebastian on Trade-marks, 226. This being a suit in equity the law which applies is that stated by Lord COTTENHAM, in *Millington* v. *Fox*, 3 Mylne & Craig, 338, where he says, " I see no reason to believe that there has in this case been a fraudulent use of the plaintiffs' marks. It is positively denied by the answer, and there is no evidence to show that the defendants were even aware of the existence of the plaintiffs as a company manufacturing steel. In short it does not appear to me that there was any fraudulent intention in the use of the marks. That circumstance, however, does not deprive the plaintiffs of their right to the exclusive use of those names." Sebastian in his last edition (1884) says, referring to this case, (p. 9,) " In equity the protection to the manufacturer was carried a stage farther in 1833 by the decision of Lord COTTENHAM in *Millington* v. *Fox*, since which time it has not been necessary to prove an actual fraudulent intention, the remedy being obtainable if the defendants' conduct has been such as to produce the effects of fraud, though he may, in fact, have acted in perfect innocence." Again, at page 11, he says: " It is not necessary that there should be fraud in the sense that the infringer knowingly and willfully makes a fraudulent attempt to appropriate to himself the fruits of another's reputation; if he acts so that custom intended for another is diverted to himself, and that the public buy and pay for one thing while intending to buy and pay for another, so that both vendor and purchaser are injured, there is fraud and the animus of the infringer is unimportant." And again, on page 156, he says:—"But the fraud does not consist in an intention to deceive on the part

of the defendant, but in an actual deception, or in the creation of a probability of deception, independently of any fraudulent intention." In reply to a similar objection raised by the defendant in the case of this plaintiff against Rogers & Spurr Mfg. Co., 11 Fed. R., 495, Judge LOWELL says: "I believe it to be true that the Greenfield Rogers did not inquire, nor did the defendants care, whose reputation they were making available; but I am of opinion that any one of those who rightfully use the name may enjoin its interfering use by others." See also *Singer Manf. Co.* v. *Wilson*, L. R., 3 App. Cas., 391; *Filley* v. *Fassett*, 44 Misso., 173. But we need not rest upon this claim. It is found that "the defendants knew that the goods which had been made and sold by the plaintiff had become known as 'Wm. Rogers goods,' and when said advertisement was published, that their goods were in the market and that they were continuing business," and also that "the defendant knew that the use of said trade-mark and said advertisement would cause their goods to become known in the market as the 'Wm. Rogers goods.'" "All that courts of justice can do is to say that no trader can adopt a trademark so resembling that of a rival as that ordinary purchasers, purchasing with ordinary caution, are likely to be misled. It would be a mistake, however, to suppose that the resemblance must be such as would deceive persons who should see the two marks placed side by side. The rule so restricted would be of no practical use. If a purchaser, looking at the article offered him, would naturally be led, from the mark impressed on it, to suppose it to be the production of the rival manufacturer, and would purchase it in that belief, the court considers the use of such a mark to be fraudulent. But I go further. I do not consider the actual physical resemblance of the two marks to be the sole question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause his goods to bear the same name in the market, may be as much a viola-

tion of the rights of that rival as the actual copy of his device." *Seixo* v. *Provezende*, L. R., 1 Ch., 192. See also *Lee* v. *Haley*, L. R., 5 Ch., 155; *Singer Manf. Co.* v. *Loog*, L. R., 8 App. Cas., 15; *S. C.*, L. R., 18 Ch. Div., 417; *Hendriks* v. *Montagu*, L. R., 17 Ch. Div., 638; *Canal Co.* v. *Clark*, 13 Wall., 323; *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Mfg. Co.*, 37 Conn., 278; *Meriden Britannia Co.* v. *Parker*, 39 id., 450. The defendants will claim that at the time of making the contract with William Rogers their conduct was not actuated by any motive towards the plaintiff; and that they had no knowledge that the plaintiff's goods were in the market, and will ask this court to believe that they were actuated by no improper motive, but solely by the desire to secure, in the manufacture of their goods, the superintendence and alleged skill of this " Rogers." If the defendants could establish ignorance on their part, we submit that such ignorance would not excuse them. But the finding shows both knowledge and fraudulent action as to the material parts of the case. " Prior to 1878 the defendant, through its officers and agents, had made several attempts to connect with itself in some way some man by the name of 'Rogers,' with a view to stamping such name upon its goods." This language is peculiar and suggestive, and clearly defines the animus of the defendants. The defendants had tried their own name; and while so stamped " their flat-ware, though of good quality and finish, did not find a ready market and its sales were quite limited." They were well aware of the large sale of flat-ware of similar quality bearing a so-called Rogers stamp. They wanted some Rogers, they cared not who, provided the name could be used upon their goods. Having negotiated, without success, in three other directions, they secured the present association. Their motive in making this contract is found to have been " to enable them to compete more successfully in the market with the makers of such goods, that is, 'genuine Rogers goods.' " Their first purpose was to secure the *name* " *William Rogers*," as a stamp, and it was the use of his name that is found to have

effected the increased and increasing sale of their goods so manufactured and stamped. If in the making of the contract the defendant was not actuated by any motive toward the plaintiff as distinguished from other manufacturers of Rogers goods, yet as one of such manufacturers, of whom there were but three, its injury, though less perhaps in amount, was none the less real. And the motive found to have actuated the defendant as against such manufacturers in general may be relied upon by the plaintiff in this action. But further, the wrong complained of is not the making of the contract with Rogers, but the advertising, stamping and selling of goods which followed. At the time of these acts it is distinctly found that "they knew the plaintiff's goods were in the market, and that they were continuing business." These later acts at least were done with full knowledge of the plaintiff's rights. We quote the finding on this point: "The defendant knew that the goods which had been made and sold by the plaintiff had become known as 'Wm. Rogers goods,' and when the advertisement was published that their goods were in the market and that they were continuing business." "The defendant knew that the use of said trademark and said advertisement would cause their goods to be become known in the market as 'Wm. Rogers goods.'" Nevertheless they continued the use of the stamp and published and circulated the advertisement in its aid, until they had created such confusion that careless and unwary buyers, and those not familiar with the plaintiff's stamps, or who did not examine the whole stamp, would confound them and buy their goods for those made by the plaintiff. The result followed as they knew it would and as they must be held to have intended that it should.

*Third.*—The defendant's stamp has given to their goods the exact name by which the plaintiff's goods had previously been known, and this fact alone is sufficient reason for the injunction sought. The finding upon this point is full and explicit. "The plaintiff's goods, from the time of the partnership, had been familiarly known as 'Wm. Rogers goods,' and no other goods by that name had ever been in the market

until the time that goods made by the defendant were put upon the market, since which time said goods have generally been known in the trade as ' Wm. Rogers goods.' " This case is in this respect like that of *Orr, Ewing & Co.* v. *Johnson*, L. R., 13 Ch. Div., 434, in which the plaintiffs, dealers in yarn which they exported to India, had a ticket containing, among other things, two elephants, which ticket had given the yarn several names by which it was sold and familiarly known, one being the " two elephant goods." The defendants, who had for some years sold yarns bearing a ticket containing, among other things, one elephant, began to export similar yarn to the same market, and placed upon it a ticket containing two elephants, but in several other respects different from the ticket of the plaintiffs, and the defendant's elephants themselves were in several particulars unlike those used by the plaintiffs. In an action by the plaintiffs for an injunction to restrain the defendants from infringing their rights it was held—(1) That if the goods of a trader have acquired in the market a name derived from a part of the trade-mark which he affixes to them, a rival trader is not entitled to use a ticket which is likely to lead to the application of the same name to his goods, even though that name is not the only name by which the goods of the first trader have been known, or though it has always been used in conjunction with some other word. (2) That though it was not probable that English purchasers or Indian dealers would be deceived, it was not improbable that the ultimate purchasers in India would be, in consequence of defendant's ticket being calculated to obtain the same name of "*Bhe Hothe*," or "two elephant," as the plaintiffs'. (3) That it was not necessary to prove any fraudulent intention on the part of the defendants. (4) That the two elephants forming a material and substantial part of the plaintiffs' trade-mark having been taken by the defendants, the burden was upon them to disprove the probability of deception, and not upon the plaintiffs to prove it." Justice FRY said :—" It appears to me that there is a great deal of evidence, to which I attach weight, to show that these goods are sold largely by

name, and that although the first dealers no doubt look at
the tickets, yet that the ultimate purchasers and the pur-
chasers from the dealers in Bombay, probably do not look at
the tickets, and at any rate are liable to be deceived by the
name by which the goods are sold." In another part of his
judgment the same justice quotes from the case of *Edelsten*
v. *Edelsten*, 1 DeG., J. & S., 202, in which Lord WEST-
BURY observed upon the fact that the goods derived their
trade-name from that particular part of the ticket, and says—
" I think therefore that when the defendants did take these
two elephants they took that which was a material and sub-
stantial part of the plaintiffs' ticket. Now what is the re-
sult of that? It appears to me that the result of this is, it
throws upon the defendants the burden of proving that their
ticket did not deceive the purchaser so that they would be-
lieve that the defendants' goods were the plaintiffs' goods,"
and continues, quoting JAMES, L. J., in *Ford* v. *Foster*, L. R.,
7 Ch., 623, to the same effect, and O'HAGAN, L. J , in *Singer
Machine Mfg. Co.* v. *Wilson*, L. R., 3 App. Cas., 395, " If
one man will use a name, the use of which has been validly
appropriated by another, he ought to use it under such cir-
cumstances and with such sufficient precaution that the rea-
sonable probability of error should be avoided, notwithstand-
ing the want of care and caution which is so commonly ex-
hibited in the course of human affairs." This language of
O'HAGAN, L. J., has been quoted with approval by the courts
of highest authority both in England and America, and has
been lately adopted by this court in *Williams* v. *Brooks*,
*supra*. The defendants appealed, and in the Court of Ap-
peal COTTON, L. J., said (13 Ch. Div., 457), " Then we
come to the question, is the use of this ticket, on goods
exported by the defendants, calculated to lead to their goods
being mistaken for those of the plaintiffs, or I may add to
lead to their goods being sold under the name under which
the plaintiffs' goods had frequently been sold, because that
is really the same thimg? * * * The conclusion at which
I have arrived is this, that the defendants either originally
adopted that ticket with knowledge of the facts, from which

the intention to mislead must be imputed to them, or at all events, if that is not so, that they persisted in the desire to continue to use that ticket when they did know the facts from which it was probable that the ticket, if used, would deceive. Therefore, in my opinion, the judgment of Mr. Justice FRY is right, and must be affirmed." On subsequent appeal to the House of Lords, WATSON, L. J., said: "Apart from all questions as to *bona fides* or *mala fides* of the appellants, I am disposed to hold that the circumstances to which I adverted afford sufficient ground for an injunction against the appellants. When a prominent and substantial part of a long and well-known trade-mark, denoting the manufacture of a particular firm, appears as the prominent and substantial part of the new trade-mark of a rival, it seems reasonable to anticipate that the goods of the latter may be mistaken for and sold as the manufacture of the firm to which the other trade-mark belongs." L. R., 7 App. Cas., 231. In the case of *Seixo* v. *Provezende*, L. R., 1 Ch., 192, the plaintiff and defendant used marks the similarity of which consisted solely in the use of the word *Seixo*, which was the name of the plaintiff's vineyard, and by which the defendants claimed that their vineyard was also called. But Lord Chancellor CRANWORTH said that, even assuming that to be true, it did not justify the defendants in adopting a device or brand, the probable effect of which was to mislead the public, and added: "I do not consider actual physical resemblance to be the sole question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause his goods to bear the same name in the market may be as much a violation of the rights of that rival as the actual copy of his device." Here the defendants, knowing the plaintiff's goods to have been distinguished for years as "Wm. Rogers goods," and knowing that the stamp proposed to be used would cause their goods to be known in the market by the same name, contracted with a Wm. Rogers, for the purpose of availing themselves of the name Wm. Rogers

, as a pretended trade-mark upon a portion of their flat ware. Their goods have become known as " Wm. Rogers goods," and " the effect of the use of his name was soon manifest in the increased and increasing sale of their goods."

*Fourth.* The defendant's infringement is not to be justified or excused by reason of the contract between the defendant and William Rogers. Let us state the defendant's claim under this head as it really is when stripped of its dress and viewed in its nakedness. It is this: The plaintiff alleges and proves that the defendant has so imitated the plaintiff's trade-mark that goods bearing the defendant's simulated stamp will be readily taken by some purchasers who wish to buy the plaintiff's goods. The defendant replies that he has a right to so imitate the plaintiff's trade-mark because he has hired William Rogers, the son of his father, who possesses in a greater or less degree the skill of his father, to supervise his, the defendant's, manufacture, and he produces the deceptive imitation only by putting on his, the defendant's, goods the name of the man he has employed to supervise. Or the proposition may be concisely stated thus: If one has a trade-mark of which a personal name forms a part, his rival in business may pirate that trade-mark, provided he employs in his factory a superintendent who happens to possess the same name. The statement of the claim is its sufficient answer. No attendant circumstances can help out its inherent absurdity. It is the goods of Simpson, Hall, Miller & Co. that bear this deceptive imitation. They are in no sense the goods of William Rogers. He has no interest in them, direct or contingent. He neither makes nor sells them; he is an overseer, a supervisor; that and nothing more. If a man uses his own name as a stamp upon his own goods in a legitimate business way with no extrinsic deception it may be the doctrine of this court in *Rogers & Bro.* v. *Rogers* that he cannot be enjoined, though his goods are thereby passed as the goods of another; but it does not follow that a manufacturer may put the name of another on his goods and thus pass them as the goods of some one else in the market. Under no imagina-

ble circumstances will a defendant be permitted thus to use another name as a stamp. The limit in this direction is certainly reached in the doctrine that a man may use his own name in his own business, whatever the result may be, so long as he intends no fraud. There is a shoreless and bottomless pit between that statement and the claim that a man may use another's name in his own business, or that a man may use his own name in another's business, no matter what the results may be. It has sometimes been argued that *Meriden Britannia Co.* v. *Parker*, 39 Conn., 450, justifies the theory that there can be a trade-mark the title to which depends upon supervision. No such doctrine is to be found in that or any other case. The reference to supervision is only to answer the defendant's claim that when the Meriden Britannia Company said to the public that the goods stamped "1847 Rogers Bros. A1" were manufactured by Rogers Bros., it was not such a material misrepresentation as disentitled the plaintiff to relief, because in fact and in truth the Rogers Bros., or some of them, supervised the manufacture of the goods. To assume that supervision may be the foundation of title to a trade-mark, and to attempt to jump from that to the assumption that supervision may be a justification of infringement, requires a wonderful amount of confidence. Trade-marks do not pass by inheritance. If they did, they would not pass to the eldest son alone. William Rogers inherited no trade-mark from his father. He cannot sell, for he does not own, his father's reputation; for the same reason, if for no other, he can not use or sell his father's name. If he has skill in the business which his father pursued, that skill may justly be the ground of compensation by his employer, but cannot be used by his employer or by himself to deceive others. The question is not whether, there being no other and prior trade-mark containing the words "Wm. Rogers" in the field, Simpson, Hall, Miller & Co. might under its contract with William Rogers put his name on its goods and thus acquire a good trade-mark as against new comers. Probably under the authority of *Meriden Britannia Co.* v. *Parker* it could, but

the question is whether, there being such prior trade-mark in the field, it can under its contract with William Rogers infringe such prior trade-mark, and that case is authority in point that it cannot. According to that case, though Parker was enjoined at the instance of the Meriden Britannia Company, the latter corporation could have been enjoined at the instance of Rogers & Bro. of Waterbury, prior occupants of the field.

*Fifth.* The right of the plaintiff, as against this defendant, is perfect as to both of its trade-marks; but if William Rogers, Jr., were himself defendant, he would, upon the facts found, be estopped to deny the exclusive right of the plaintiff to the trade-mark " Wm. Rogers Mfg. Co." This was the name of the original copartnership, taken by contract with Wm. Rogers, Sr., and has been used by the copartnership and the plaintiff, without question or objection from either father or son, ever since its adoption in 1867. It is found that Rogers has several times complained of the use by the plaintiff of the stamp Wm. Rogers & Son, claiming it to be his personal mark, but no complaint is found because of the use of " Wm. Rogers Mfg. Co." This is the trade-mark which gave name to the goods as " Wm. Rogers goods." Had they been called after the other they would have been " Wm. Rogers & Son " goods. Can there be upon the facts any doubt that William Rogers himself would, if personally defendant, be estopped to deny the exclusive right of the plaintiffs to the use of this mark?

*C. R. Ingersoll* and *C. E. Mitchell*, for the defendant.

1. William Rogers, as a manufacturer of plated-ware, would have the right to use his own name as his trade-mark, or as a part of his trade-mark, whatever use had been made of the same name by any other manufacturer, and it is not necessary for us to deny the right of the plaintiff to the use of the trade-mark which it claims. The fact that two men bearing the same name may each have a high and valuable reputation in the same art, and may each give his name to the goods of his production, and that

more or less inconvenience may result from the identity of such names, is no reason for requiring one of them to withdraw from the business of such art or trade, or to give up the valuable reputation to which he is entitled, by adopting some other name by which he will lose his personal significance. And this where both the men are in full life and active business. With much less reason can this plaintiff avail itself of the reputation of the William Rogers, the father, who died in 1873, to prevent William Rogers, the son, enjoying the reputation which he has largely made for himself since the death of his father. In any case, the inconvenience resulting from the mere identity of business names, if it be proved (which in the present case we deny), is *damnum absque injuria*. And this, too, has been settled by this court in *Rogers & Brother* v. *Rogers*, 53 Conn., 121. It also necessarily resulted from the decision of this court in *Meriden Britannia Co.* v. *Parker*, 39 Conn., 450, where the stamps of William, Asa and Simeon Rogers, individually and collectively, were held to be rightfully used, although concurrently, and under circumstances causing them easily to be confounded one with another.

2. William Rogers is to be regarded as standing in the position of a manufacturer of the goods under his contract with the defendant. The case of *Meriden Britannia Co.* v. *Parker*, above referred to, indicates the rule which distinguishes between using a name as a decoy, and forming a legitimate business alliance with a man who is celebrated in his art, which gives him the supervision and control of the business, and makes him the manufacturer in the only sense that is vitally related to the stamp. In this case the court, after referring to the contract relations between the Meriden Britannia Company and the brothers Rogers, says: " We have thus referred to the details sufficiently perhaps to show conclusively that the public were in no sense defrauded by whatever representation the trade-mark contained, and that such representation, so far as it indicated that the Rogers brothers were the manufacturers of the goods in question, was in an important sense true. All

that the public or the trade cared to know was, that the goods were the production of their skill and experience. This fact, as it seems to us, clearly appears. The further fact that the petitioners furnished capital and machinery, employed and paid laborers, and sold the goods, is entitled to but little weight so far as this question is concerned, although it shows that, in another sense, the petitioners were the manufacturers of the goods." All that the public cares to know of the goods marked "(Eagle) Wm. Rogers (Star)" is that they are the production of the skill and experience of the William Rogers whose name they bear. The stamp is right in saying that they are made by him in the only vital and important sense. They are his goods in respect of origin and quality, and his right to stamp them with his own name is incontrovertible unless capital is the only factor in business enterprises. What is there in the standing or conduct of the defendant which prevents it from co-operating with William Rogers in business, in the same way in which the plaintiff's predecessor and the Meriden Britannia Company co-operated with him and his father, and in so doing found themselves sanctioned by established usage and protected by the courts? But suppose we forget that this is a Rogers mark, and treat it as if it had no special genius and no distinguishing history, and suppose William Rogers is to be treated as if he had no more to do with the business than a salesman. In *Williams* v. *Brooks*, 50 Conn., 278, the goods of the plaintiffs, D. F. Taylor & Co., had a good reputation and ready sale as "Taylor's Hair-pins." The plaintiffs claimed to derive their right from a previous D. F. Taylor & Co., originator of the make, just as in this case. The defendants used the mark, "L. B. Taylor & Co.," claiming a right to do so because Levi B. Taylor (who had been employed with his father as early as 1869 in the hair-pin business) was associated with the defendant as his travelling salesman, with a remuneration depending upon the amount of sales effected by him. But there was no injunction against using the word "Taylor," although the plaintiffs' goods were sold as "Taylor's Hair-pins," among

other names, and in neither opinion filed in the case is there a suggestion that L. B. Taylor might not make a contract for the use of his name for a continuing commission when he was so far connected with the business as to be its salesman, and have his rights protected under the rule that a man may do business in his own name and another may aid him in so doing. In *Hallett* v. *Cumston*, 110 Mass., 29, the defendant Cumston had marked pianos "Hallett & Cumston," having made an arrangement with a man by the name of Hallett, under which he claimed the right to do so. The plaintiff's name was Hallett, and he had formerly been in partnership with the defendant Cumston, making pianos marked "Hallett & Cumston." The defendant filed a demurrer, which was sustained by the court in an opinion by Judge GRAY, saying: "But they had a right, acting in good faith, to use the name of any other person with his consent, whether it was or was not the same as the plaintiff's. *Emerson* v. *Badger*, 101 Mass., 82. This bill cannot be maintained for an unlawful use of the plaintiff's name, for want of any distinct and sufficient allegation that the defendant used the name of Hallett with intent to represent it to be the name of the plaintiff, and thereby to defraud and injure him." This case related to the use of a personal name as a trade-mark on pianos. That which it was essential to allege in the Massachusetts case is essential to be proved in the pending case; but such proof is wholly wanting. Of course we distinguish our case from cases in which the name of an unknown person is used simply to carry out a scheme of fraudulent personation. Such a case was *Wm. Rogers Mfg. Co.* v. *Rogers & Spurr Mfg. Co.*, 11 Fed. Rep., 495. There the corporation defendant had hired the use of the pretended trade-mark of two Rogerses, in whose hands the mark had never had any vitality. In that case Judge LOWELL says: "The history of this trade-mark is that D. C. Rogers and George E. Rogers applied in February, 1879, to the patent office to register under the act of Congress a trade-mark consisting of the words 'Rogers & Son,' with an arrow. In the sworn application or 'state-

ment and declaration' required by law, they represented themselves as doing business at Greenfield, Massachusetts, under the firm name of Rogers & Son, and declared that they intended to use the trade-mark upon table cutlery, knives, forks, etc. Mr. Grinnell of Greenfield, whom D. C. Rogers consulted upon the subject, asked him the pertinent question whether he intended .to use his trade-mark himself, or merely to trade upon, and he answered that he intended to use it in the manufacture of goods himself; and the application to the patent office conforms to this answer. But what the father and son did was to trade upon it; they let it out to George W. Spurr & Co. for a royalty, and afterwards to the defendants for a royalty. This royalty is paid for a falsehood. The names of these Rogerses is not of the slightest value in the silver-plating business, which they never learned or practiced; nor were they ever partners, as I read the evidence, except in hiring out this trade-mark. It is impossible for this royalty to be paid for anything but the chance of purchasers supposing it to represent some other Rogerses. A court of equity cannot be expected to look with much favor upon a trade-mark thus acquired and used." A similar case is *Meriden Britannia Co.* v. *Parker*, 39 Conn., 450. In that case the defendant borrowed the name of C. Rogers &. Bros. C. Rogers & Bros. had not been spoon and fork makers at all, and did not and could not control and guarantee the quality of the defendant's goods. They had no standing in the market as spoon and fork makers; they had no connection with the business of the defendant. The purpose of the defendant was clearly to borrow a name unknown in the business to personate a name that was celebrated in the business. Of course the court took no notice of such a subterfuge, and disposed of the case as if C. Rogers & Bros. had no existence. These two cases are the leading cases to sustain the proposition that the defendant may not say that he does not infringe because some person unknown in the art has lent the infringer a name which is like the name of the plaintiff; but it is needless to add that such cases throw no

light upon the case in hand, excepting as they present facts which in their general scope and significance are the exact opposite of those which are found by the distinguished committee. And so we say that by long established usage in connection with the Rogers name, and by the decisions of the courts, William Rogers is authorized to do business in his own name, under his own stamp, and no injunction will lie against him, either directly or indirectly through the defendant. For an injunction against the defendant would be an injunction against William Rogers, and deprive the business world of the services and stamp of the only man who is to-day a skilled and recognized representative of the ancient name, and the only man whom the business world relies upon to see that the name shall remain untarnished for another generation.

3. The defendant has not exceeded its right in employing circulars and advertisements. A trade-mark is addressed to the ultimate purchaser, and goes with the goods for that purpose. An advertisement or circular is addressed to those who buy direct from the manufacturers, and expends its force either in guiding or misguiding sharp and intelligent men. A somewhat different rule is therefore applicable, arising out of the fact that what would mislead an uninformed consumer would have no tendency in that direction in the mind of the intelligent trader. But nothing could exceed the painstaking care with which the defendant and William Rogers have sought to direct attention to the fact that their goods are separate from all other goods in the market, because they are the only goods manufactured under the supervision of the only living, genuine Rogers. The finding disposes entirely of the claim that the defendant made any false representation by its advertisements or circulars.

PARDEE, J. This is a complaint for an infringement of a trade-mark, asking for an injunction and damages.

Between the years 1847 and 1850 William Rogers, Sr., acquired and preserved to his death in 1873 a valuable

reputation in the market as a skillful and honest manufac-
turer of silver-plated ware.  His son William Rogers, Jr.,
from boyhood had connection with the manufacture of such
ware by the various concerns with which his father was
connected.  By reason thereof since 1864 to this present he
has had a valuable independent reputation in the market
for skill and integrity in such manufacture.

The plaintiff is a corporation organized in 1872 and en-
gaged in the manufacture of silver-plated ware at Hartford,
using since its organization trade-marks as follows :—" Wm.
Rogers Mfg. Co.", " 1865 Wm. Rogers Mfg. Co.", and
" (Anchor) Wm. Rogers & Son ; " claiming to own the
exclusive right to them by the assent of William Rogers,
Sr., and by long continued use, and denying to the defen-
dant and William Rogers, Jr., the right to use any stamp of
which the word " Rogers " shall be a distinctive and charac-
teristic part.

The defendant is a corporation engaged in the manufac-
ture of silver-plated ware at Wallingford, Connecticut.  In
1878 it made a contract with William Rogers, Jr., by
which it was agreed that he should exercise his skill in
supervising the process of manufacture and control the
quality and style of ware, and allow his name to be stamped
thereon, and defend the use thereof.  The consideration
for this agreement is a commission upon sales.  William
Rogers, Jr., has performed his contract in every particular.
The ware has been sent into the market bearing the stamp
" (Eagle) Wm. Rogers (Star)."  This stamp is liable to
mislead those dealers and consumers who take note of the
word " Rogers " or words " William Rogers " only, or who
are not familiar with the stamps of the plaintiff.  Of which
the plaintiff complains.

The complaint and briefs of the plaintiff make it quite
clear that  the one valuable word in its name and trade-marks,
the one word which it is the purpose of this proceeding to
preserve for its sole and exclusive use upon silver-plated ware,
is the word "Rogers," the right to the possession and use of
which it derived from William Rogers, Sr., and it denies to

William Rogers, Jr., the right either to manufacture silver-plated ware without the intervention of any agency, and stamp his name thereon; or the right to manufacture through the agency of the defendant, and stamp; or the right to manufacture under the particular arrangement which exists for that purpose with the defendant, and stamp. The prayer is that the defendant be enjoined from every form of representation that William Rogers, Sr., is in any way connected with it in the manufacture of silver-plated ware, and from offering for sale any ware upon which is impressed any mark or device of which the words " Wm. Rogers " are the distinctive and characteristic part.

The following are among the additional facts of the case: The defendant was well aware of the value of the name " Rogers " on spoons, if it represented a person who had belonged to the family of William Rogers, Sr., had been connected with him in the manufacture of silver-plated goods, and had acquired a valuable reputation in the market for skill in that art. It entered into the contract with William Rogers, Jr., for the purpose of using his name upon such goods as should be the result of his skill, and of availing itself of his taste, skill and judgment, and from the belief that consumers would regard spoons manufactured under his supervision as being the goods of a genuine Rogers, because his skill had been acquired under the instruction of William Rogers, Sr., his father. It stamped its goods " (Eagle) Wm. Rogers (Star) " for the purpose of informing the public that they were the product of the skill of Wm. Rogers, Jr., for the purpose of taking advantage of his reputation in the market; a reputation acquired because of the knowledge of the public that he had been associated with, and had acquired skill in the art from, his father and others. He had been known to the trade during many years and had acquired and retained a valuable independent reputation in the market; and goods known to have been the product of his skill alone had for that reason a better selling value. For the preceding thirteen years he had been almost constantly employed in connection with

such manufacture with the plaintiff and the Meriden Britannia Company; and both of those companies had extensively circulated his portrait in connection with that of his father and had thus brought him prominently to the notice of the trade in connection with his father. He had always insisted that his name should be used only on goods of a certain high standard of value. He does in fact superintend the manufacture of all articles upon which his name is placed. His stamp has a high and independent value. By the terms of the contract between the defendant and William Rogers, Jr., the latter has the right to authenticate the goods made under his superintendence by stamping thereon his name, with such accompanying devices as he may adopt. The finding is that the stamp " (Eagle) Wm. Rogers (Star) " was not adopted by the defendant for the purpose of imitating the trade-mark of the plaintiff, but as a new and distinctive trade-mark indicating the personal supervision and control of William Rogers, Jr. It is also found that the arrangement is valuable to him and that it is only through the medium of this or some similar contract that he is able to make his special training in the business available to himself; also that the name of William Rogers, Jr., is not used by himself or the defendant in such association with place or marks, or symbols or signs, or forms of packages, or style or color of labels, as thereby to mislead consumers; and that the word " Rogers," used with or without differing symbols, is the misleading word. As a fact it does mislead many consumers who are not familiar with the marks both of the plaintiff and the defendant, and many who take no note of anything in the marks beyond the word " Rogers." This the plaintiff seeks to prevent.

Passing over the defendant's denial of the plaintiff's right to the exclusive use of the trade-mark which it has adopted, and assuming for the purposes of the case that the plaintiff is a person who, bearing the name William Rogers, has adopted and used his name as a trade-mark, yet the prayer for injunction must be denied.

By the rule prevailing in this jurisdiction the facts of this

case have been conclusively settled by the court below, acting through the instrumentality of its committee. By the finding fraud in intent or deed has been eliminated from the case. The misleading has resulted simply from the fact that the plaintiff and William Rogers, Jr., bear the same name, and that such consumers only have been confused as would not take note of the distinguishing symbols accompanying the use of the name of William Rogers, Jr., by the defendant. When the second bearer of a name uses it with due distinguishing precautions and without actual fraudulent intent or representation that his wares are those of the first, he is not responsible for such confusion as results solely from the fact of similarity.

The law permits a manufacturer to use his name as a trade-mark. If he has the confidence of the public in his integrity and skill his name will doubtless be for some reasons the most advantageous trade-mark which he can adopt. It will be the most forcible and permanent presentation of the fact that his skill and integrity have gone into the article upon which his name is stamped. But such selection exposes him to this danger :—some other person bearing the same name may be the manufacturer of similar articles and may impress it upon them, thereby creating a possibility of mistake on the part of consumers as to the origin and ownership of the article they are about to buy. The law also gives to a manufacturer the right to use his own name as a mark upon his goods although it be the same as that of another manufacturer of similar goods who has previously made his name a part of his own trade-mark, if in such use by the former there is no false representation.

Because of confusion resulting from the use of identical names with distinguishing symbols there is not necessarily as a matter of law a fraudulent misrepresentation; actual fraudulent intent remains to be proven as a fact. If the first appropriator of his name as a mark adopts the name simply, without any accompanying word or symbol by way of prefix or suffix, another manufacturer of similar goods having the same name may lawfully impress it upon his goods, if, as

in the case at bar, he accompanies it by such distinguishing
devices by way of prefix and suffix as that a consumer who will
take note of the whole will not be misled.    And if consumers
who will take note of nothing but the name are misled, and
there is consequent loss to either, it must be borne as the result
of the act of taking a name as a trade-mark.    If the first ap-
propriator affixes such distinguishing marks, figures, sym-
bols or words as he may lawfully subject to his exclusive
use, the second may not use his name in connection with
like marks, figures, symbols or words; nor with such as so
closely resemble those of the first as that the association
will probably mislead; nor make such use with intent to
mislead.    *Rogers & Brother* v. *Rogers*, 53 Conn., 121;
Brown on Trade-Marks, (2d ed.) sec. 420.

In *Burgesss* v. *Burgess*, 3 D., M. & G., 896, Lord Justice
TURNER said as follows: "I concur in the opinion that this
motion should be refused with costs.    No man can have any
right to represent his goods as the goods of another person,
but in applications of this kind it must be made out that the
defendant is selling his goods as the goods of another.
When a person is selling goods under a particular name,
and another person, not having that name, is using it, it
may be presumed that he so uses it to represent the goods
sold by himself as the goods of the person whose name he
uses; but when the defendant sells goods under his own
name, and it happens that the plaintiff has the same name,
it does not follow that the defendant is selling his goods as
the goods of the plaintiff.    It is a question of evidence in
each case whether there is a false representation or not."
Of this, in *Massam* v. *Thorley's Cattle Food Co.*, L. R., 14
Ch. Div., 748, JAMES, L. J., said as follows: "That I take to
be an accurate statement of the law, and to have been adop-
ted by the House of Lords in *Wotherspoon* v. *Currie*, L. R.,
5 H. L., 508, in which the House of Lords differed from
the view that I had taken in that case."

In Sebastian upon the Law of Trade-Marks, p. 25 et seq.,
it is said as follows: "The impossibility of a single manufac-
turer being allowed to arrogate to himself the exclusive use

of a name which he shares in common with many other persons is apparent; and from this circumstance the rule was deduced that while, as against persons bearing a different name, a manufacturer's right in his name trade-mark is absolute and exclusive, as against persons bearing the same name no such exclusive right can be set up. Thus in *Dence* v. *Mason*, Sebastian's Digest, 534, MALINS, V. C., held that during the continuance of the partnership between two persons named Mason and Brand, they could not be prevented from using the latter's name in their business, notwithstanding that it was well known in connection with a similar old established business; and the Court of Appeal held that the same would be the case if a new *bonâ fide* partnership should be formed. This rule must, however, be qualified by the statement that where a person uses his own name for the purpose of fraud, and satisfactory evidence of fraudulent intention can be produced, such unfair conduct will be restrained, even though the free use of the man's own name may be thereby hindered, and the criminal law also admits of the punishment of such fraudulent uses of a man's own name. A valuable statement of the law was made by Lord CRAIGHILL in the Scottish Court of Session, in *Dunnachil* v. *Young & Sons*, in which he said: 'The name of a person may be a trade-mark; there may be other manufacturers of goods of the same description, and the latter are not precluded from placing their own names on their goods by reason of the fact that this name has already become the trademark of another manufacturer. The only condition they must fulfil is, that the name as used by them shall be accompanied with something which shall be a distinction, if the bare name would lead to the deception of the public and the injury of the trader on whose goods the name first appeared as a trade mark.' And in the New York case of *England* v. *The New York Publishing Co.*, 8 Daly, 375, DALY, C. J., said:—' The fact that a man has used his own name to designate the article he produces, and that the name has become valuable to him through the article becoming extensively known, gives him no right to exclude

any other man of the same name from affixing his name upon the same kind of article, if he manufactures it. The test is, whether he uses the name honestly and fairly in the ordinary prosecution of his business, or dishonestly, to palm off his own commodity as the production of another.'" And on pp. 226 et seq. as follows :—" It was formerly sometimes supposed, and was held by the late Master of the Rolls and the Court of Appeal in *Singer Manufacturing Co.* v. *Wilson*, L. R., 2 Ch. Div., 234, that for an action to restrain the use of a trade-name to be successful fraud must be proved; on the ground that when a trade-mark was once affixed to the goods it passed with the goods from hand to hand, thus silently repeating to each successive purchaser the original misrepresentation of the original infringer, while the improper use of a name not affixed to the goods was not the necessary consequence of being in possession of marked goods, but was the individual act of each person who used it in respect of the goods ; so that there might be held to be an infringement of a trade-mark when, in analogous circumstances, there would be no infringement of a trade-name. And when the case of *Singer Manufacturing Co.* v. *Wilson*, L. R., 3 App. Cas., 376, was remitted by the House of Lords to the Court of First Instance, on the ground of insufficiency of evidence, some of the law peers seem to have thought that different principles of law might possibly be applicable to trade-marks and trade-names. But Lord CAIRNS, Chancellor, said, " It may well be that if an imitated trade-mark is attached to the article manufactured, there will from that circumstance be the certainty that it will pass into every hand into which the article passes, and be thus a continuing and ever present representation with regard to it ; but a representation made by advertisements that the articles sold at a particular shop are articles manufactured by A. B., (if that is the legitimate effect of the advertisements, which is a separate question,) must, in my opinion, be as injurious in principle, and may possibly be quite as injurious in operation, as the same representation made upon the articles themselves; and in *Singer Manufac-*

*turing Co.* v. *Loog*, L. R., 8 App. Cases, 15, Lord BLACK-
BURN took the view that the law of trade-marks and
trade-names, when not affected by legislation, was the
same. Whether there is or is not property in a trade-name,
as Lord BLACKBURN suggested, it is a fraud on the part of
one person to attract to himself the custom intended for
another, by a false representation, direct or indirect, that
the business carried on by himself is identical with that of
the other person by whose ability and exertions the name
has acquired the reputation it possesses. The question is
not whether the defendant's business is represented as being
similar to the plaintiff's, but whether it is represented as
being that very identical business. If such a false repre-
sentation has been made, whatever may have been the mo-
tive of the persons making it, when proceedings are taken
in consequence of it, all the court requires is to be satisfied
that the names are so similar as to be calculated to produce
confusion between the two—so calculated to do it that,
when it is drawn to the attention of those adopting the
name complained of that that would be the result, it is not
honest for them to persevere in their intention, though orig-
inally the intention might not have been otherwise than
honest."

The cited remark of Lord BLACKBURN was made by him
in determining a case in which the defendant neither bore
nor had acquired any right to use the name of " Singer,"
the distinctive and conspicuous portion of the plaintiff's
trade-mark. *Singer Mfg. Co.* v. *Loog*, L. R., 8 App. Cases,
15; and such is the fact in *Singer Mfg. Co.* v. *Wilson*, L. R.,
2 Ch. Div., 434; and we think we are correct when we say
that the same fact pertains to all of the cases cited by Mr.
Sebastian, and that neither the citations nor his comments
concern cases where the question is between parties bearing
the same name.

By the law applicable to the facts established by the find-
ing, William Rogers, Jr., as a manufacturer of silver-plated
ware, had the right to impress thereon the stamp complained
of; had the right to contract with the defendant that it

should make the ware for him under his supervision, he to receive, stamp and sell it for himself; the defendant to receive a percentage of the profits for its labor and its capital; he a percentage for his skill, supervising labor and valuable reputation in the market—his capital. By the present contract the defendant furnishes machinery and materials; William Rogers, Jr., the supervising labor and skill, the valuable reputation and stamp, and defends the use of the latter; the defendant sells the ware, and receives payment therefor; the profits are divided. Under one mode he would sell, and take the risk of payment; under the other the defendant would sell and take that risk; the same rule for division of profits presumably would obtain under either mode. The law regarding substance more than form will not withhold from him in one of these modes what it would concede to him in the other. The law does not find in the mode in which he makes his skill, integrity and valuable reputation available as his capital, any sufficient reason for barring him from access to the public and from the resulting profits. His skill and supervising labor have gone into the ware bearing the stamp complained of; it is equal in quality to that of the plaintiff; as between him and the plaintiff, the question being as to his right to go into the market with his own name, the putting of his supervising skill and labor into the work, with the reception of a share of resulting profits, constitutes him a manufacturer thereof in the eye of the law. It is not a legal prerequisite that all of the capital and all of the profits shall belong to him; consumers have the result of his skill and integrity; and to them that is all there is in the word "manufacturer"; he determines the kind, form, quality and value of the ware; it is his creation; the defendant simply executes his commands. Indeed, it must be a matter of indifference to the plaintiff as to which of these modes of reaching the market he shall adopt. Therefore, passing by the form, and going directly to the substance, we take the case as if of record William Rogers, Jr., were defendant.

In no other way can the real question be reached and disposed of.

If any person or corporation shall hereafter place upon the market silver-plated ware bearing a stamp the conspicuous and valuable part of which shall be the word "Rogers," and therefore liable to mislead consumers as to the origin and ownership of the same, the right to do so can be subjected to the test of judicial investigation and determination. If the judgment is that a person having the same name as that which this plaintiff has rightfully adopted and used, and a valuable name and reputation in the market for skill and integrity in the manufacture of silver-plated ware, has made an arrangement with a person or corporation having capital, by means of which, upon a division of profits, he can gain access to the market and make his skill and name available to himself and beneficial to the public; that there is no intent upon the part of either to mislead consumers; that there has been no use of the name in association with misleading signs, words, figures or symbols; and that in fact consumers are not misled by anything except the presence of the word "Rogers," and the omission to note distinguishing symbols, the law does not condemn the arrangement. The injurious result is one of the disadvantages assumed by the person on whom it falls when he selected a personal name as his mark. The objection on the part of the plaintiff at this point rests not upon any legal principle, but upon its distrust as to the ability of the court to detect and prevent fraud. But it is to be remembered that contests between persons bearing the same name as to their right respectively to stamp it upon goods, turn largely upon the intent; that it is a question of fact; and that courts have been and presumably will continue to be equal to the determination of it.

It is the argument of the plaintiff that its goods became known in the market as "Rogers goods;" that the defendant's goods are also known by the same designation; and, therefore, that the latter should be enjoined. But the disadvantages attending the choice of the name of a person as a mark affect every result flowing from such choice. The

speech of the market, calling the plaintiff's goods "Rogers goods," is only the spoken trade-mark of consumers in repetition of the one stamped upon the ware, induced by that. If William Rogers, Jr., has a right to put the name "Rogers" on similar ware, that right cannot be affected by the fact that consumers apply the same spoken trade-mark to it; he is not to be injuriously affected by any use the public may make of a mark which the law allows him to use. The plaintiff has no greater right to prevent the misleading of consumers in the matter of calling the goods of both "Rogers goods" than it has to prevent the same result in the matter of using identical names accompanied by differing symbols as stamps. The mischief is the same in origin, kind and degree. If the plaintiff had impressed the form of two elephants upon its ware as its trade-mark, neither the defendant nor William Rogers, Jr., would have the right to so impress two elephants upon ware as to mislead consumers as to the origin and ownership of the goods. If by reason of the plaintiff's mark its goods had come to be known in the market as "two elephant goods," neither the defendant nor William Rogers, Jr., would have the right to so mark goods as that they should come to be similarly known. William Rogers, Jr., has a right to the use of his own name; but he has no right whatever to the use of the form of two elephants in such manner as to interfere with the right of the first appropriator of that device. He would be a trespasser from the beginning in a forbidden field; and without necessity or excuse, for every other form in nature is at his service; and this regardless of his intent; and even if he had done it in ignorance that the device had been appropriated by another.

The first count in the complaint charges the defendant with the publication of an advertisement to the effect that it is a manufacturer of the celebrated William Rogers, Sr., spoons, forks and knives. The finding is that the defendant knew that the use of the mark and the publication of the advertisement would cause its goods to be known in the market as "Wm. Rogers goods;" but the advertisement was not intended or calculated to induce the public to

believe that the goods so designated were manufactured by the plaintiff. The purpose of the publication was to direct public attention to the fact that the manufacture of its goods was controlled by William Rogers, Jr., whose name they bear, and to the celebrity of its goods because of his supervising skill and reputation. Upon the facts, the defendant by permission from William Rogers, Jr., for its own advantage and for his as well, has availed itself of whatever right he had to use his own name, with cautionary accompanying devices, for the honest purpose and intent of informing consumers that his labor and supervising skill have gone into the manufacture of spoons at the manufactory of the defendant at Wallingford. The word "Rogers," regardless of the devices, is the sole source of confusion.

The portion of the defendant's circular complained of in the second count is as follows: "Sectional Plated Spoons and Forks—(Eagle) Wm. Rogers X 12. Triple plated upon all points exposed to wear. Plated by the method invented by Wm. Rogers in 1855, who was the original inventor of Sectional Plate. Wm. Rogers, (since 1878,) Wallingford, Conn., formerly of Hartford and West Meriden."

The finding is that it "is not misleading to a person familiar with the facts stated therein and with the fact that William Rogers, Sr., died in 1873; but persons not so familiar might be led by it to suppose that the William Rogers who was the inventor of sectional plate in 1856, was in the employ of the defendant at the time the circular was printed" in 1880.

Upon the finding these statements are true; and there is no finding that they were made with the fraudulent intent to mislead the public into the belief that the goods so advertised were those of the plaintiff, and, as in all of the other parts of the case, upon the last analysis the confusion is found to reside in the fact that two manufacturers bearing the same name, having equal skill and reputation in the same art, have each stamped his name upon his goods with distinctive symbols. As has been said, having equal rights,

under such circumstances they must share both the advantages and disadvantages of the situation.

The Superior Court is advised to dismiss the complaint.

In this opinion CARPENTER and GRANGER, Js., concurred. PARK, C. J., and LOOMIS, J., concurred fully in the legal principles laid down in the opinion, but thought that, under the arrangement made by William Rogers, Jr., with the defendant company for the manufacture and sale of the ware stamped in the manner in question, he could not be regarded as standing in the position of a manufacturer of the ware.